```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA

WEEKS MARINE, INC.                     CIVIL ACTION

VERSUS                                 NO: 15-600 c/w 15-611
                                       APPLIES TO ALL

RODNEY WATSON                          SECTION: "J"(2)
```

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter came on for trial before the Court, sitting in admiralty without a jury, on May 16 and 17, 2016. Having considered the testimony and exhibits introduced at trial and applicable law, the Court issues the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

This case arises out of an accident which occurred on September 24, 2014 aboard the ocean going dredge B.E. LINDHOLM. Rodney Watson, the vessel's cook, alleges he was injured when he was struck by a large steel steam table that toppled over in the galley in rough seas. Watson also claims punitive damages and attorney's fees due to the willful failure of his employer, Weeks Marine, Inc., to pay maintenance and cure.

On February 26, 2015, Weeks Marine filed a Complaint for Declaratory Judgment against Watson seeking a judgment declaring that Weeks was not obligated to make maintenance and cure payments beyond January 15, 2015. Watson then filed a Complaint for Damages alleging negligence under the Jones Act, 46

1

U.S.C. § 30104, et seq., the unseaworthiness of the B.E. LINDHOLM, as well as compensatory and punitive damages for Weeks' willful failure to pay maintenance and cure. The two complaints were consolidated for a bench trial. For purposes of simplicity, Rodney Watson will be referred to as the "plaintiff" and Weeks Marine, Inc. as the "defendant."

**FINDINGS OF FACT**

1.

Weeks owned and operated the dredging vessel B.E. LINDHOLM and employed Watson as an unlicensed mariner and cook aboard the vessel. As an unlicensed mariner and cook, Watson had no training or responsibility for deck work or vessel equipment inspections. Weeks considered Watson a competent cook who received consistent favorable job performance evaluations and several pay raises during his four years with the company.

2.

On the morning of September 24, 2014, the B.E. LINDHOLM was underway, sailing from Norfolk, Virginia to Charleston, South Carolina in the Atlantic Ocean. The vessel was operating on one of two engines, which made the vessel more difficult to maneuver and operate in heavy seas. Captain William Hambrecht was aware of the engine problem and an approaching storm front before the voyage but decided to depart nonetheless. Anticipating rough seas, the Captain ordered the crew to secure gear on the deck and instructed

Watson to secure loose items in the galley such as cups, dishes and cookware.

3.

On the morning of September 24, 2014, Watson was in the galley preparing a meal for the vessel crew. Seas were reported to be anywhere from 6 to 10 feet. These weather conditions, although rough, were not anything beyond which the vessel expected to encounter and within its capacity to handle. As Watson turned away from the steam table to continue meal preparation, a large wave caused the vessel to roll, and the 400 pound stainless steel table suddenly toppled over, striking Watson on his left hip and leg and causing him to strike his head on the adjacent galley bulkhead.

4.

The steam table in question had been aboard the B.E. LINDHOLM since at least 1986. The manufacturer's literature provides no instruction, nor did it provide equipment to secure the table in place when used aboard a vessel. It had never toppled over before this incident.

5.

Years earlier, a Weeks employee had secured the table in place with two threaded tube shaped fittings. A bolt extended inside of each tube. Loosening the bolt caused the fitting to lengthen and placed downward pressure on the steam table and upward pressure on the underside of an adjacent serving counter. The bolts required

proper adjustment to be as tight as possible in order to provide sufficient force to secure the table in place. The table was not bolted or welded to the serving counter, adjacent bulkhead or the galley deck, although Weeks admits it was feasible to do so. Further, Weeks had no policy or practice requiring the vessel captain or crew to periodically check the bolts to maintain proper tension.

6.

Following the incident, Watson remained aboard the B.E. LINDHOLM for three days until she reached port in Charleston, South Carolina. On September 27, 2014, Captain Hambrecht took Watson to Dr. Jeffery Herman of MedCare Express North Charleston, where Watson complained of left hip and knee pain. Watson was given pain medicine and crutches.

7.

On October 2, 2014, Watson was evaluated by Dr. George Pappas of South Carolina Sports Medicine and Orthopedic Center. Watson repeated his complaints of left leg and knee pain. Dr. Pappas examined Watson and ordered an MRI of Watson's left leg to investigate possible left knee ligament or meniscus damage. Weeks refused to authorize or pay for this diagnostic test.

8.

Watson returned home to Louisiana and began treating with board certified orthopedic surgeon Dr. Roch Hontas on October 16,

4

2014. Watson complained of left knee and leg pain as well as tingling and numbness in his left foot. Hontas noted a decreased strength in Watson's left foot flexion and possible sciatic nerve injury in addition to a left knee injury. He prescribed physical therapy and a return visit.

9.

Watson followed up with Dr. Hontas on November 6, 2014, complaining of pain, numbness and tingling in the left leg, knee, ankle, and foot and a popping sensation in the left knee. Hontas found decreased sensation on the top of the foot and continued left foot flexion weakness. He ordered continued physical therapy, an MRI of the left knee and a left lower extremity nerve conduction study. Weeks approved the nerve conduction study but again refused to pay for the MRI. The nerve conduction study was reported as normal.

10.

Watson returned to Dr. Hontas on December 19, 2014 and January 9, 2015 with ongoing complaints of left knee pain and numbness and a burning sensation in his left leg. Weeks scheduled an Independent Medical Examination (IME) with Dr. Gordon Nutik on January 15, 2015. Dr. Nutik opined that there were no objective findings, no need for additional medical treatment and found Watson to be at maximum medical improvement (MMI).

11.

Weeks terminated Watson's maintenance and cure benefits on the basis of the January 15, 2015 report from Dr. Nutik. When Watson returned to Dr. Hontas for his next scheduled examination, he was told by a nurse that Weeks had refused to pay for any additional treatment by Dr. Hontas. Dr. Hontas never found Watson to be at MMI and never released Watson to return to work. Weeks contacted Watson and told him to report back to the B.E. LINDHOLM to resume his chief cook duties. When Watson refused due to his ongoing physical symptoms, Weeks fired him.

12.

Watson then retained an attorney who referred Watson to board certified orthopedic surgeon Dr. Kenneth Berliner in Houston, Texas on February 10, 2015. Watson complained of cervical spine, lumbar spine and left knee pain as well as headaches. Various MRI studies of the same date revealed a possible torn left knee meniscus and multilevel disc abnormalities in Watson's cervical and lumbar spine, including a four millimeter herniation at the L4-5 level. After three months of physical therapy, Watson underwent epidural steroid injections to his cervical and lumbar spine on May 27, 2015, followed by additional physical therapy.

13.

At Weeks' request, Watson returned to Dr. Nutik on June 15, 2015. Dr. Nutik reported that Watson should have reached MMI but

that he could not say whether Watson was physically capable of returning to work as a cook. Dr. Nutik ordered and Weeks paid for the same left knee MRI previously requested by treating orthopedic surgeons Pappas and Hontas but rejected by Weeks. This MRI was reported as normal.

14.

On July 30, 2015, a second nerve conduction study was performed at Dr. Berliner's request. The test showed mild active left L5 radiculopathy suggestive of an acute to sub-acute process. Dr. Berliner suspected that the radiculopathy was caused by a facet joint injury or the four millimeter L4-5 disc herniation demonstrated on the MRI.

15.

On January 13, 2016, following more physical therapy, Watson underwent a L4-5 medial-branch nerve block that provided temporary relief from the radiating pain, tingling and numbness in his left leg and foot.

16.

Watson's last visit to Dr. Berliner occurred on March 17, 2016, at which time a CT Myelogram of the cervical spine was performed. Based on the results of that diagnostic testing, Dr. Berliner recommended a two level cervical disc fusion at C4-5 and C5-6. The doctor also diagnosed possible internal derangement to Watson's left knee, for which he recommends a left knee arthroscopy

due to the inconsistent MRI results, and a possible left knee meniscectomy. Due to Watson's disc herniation at L2-3, facet strain/nerve injury at L4-5, Dr. Berliner also recommended a Radiofrequency neurotomy procedure and continued observation. Dr. Berliner relates the need for the recommended additional treatment and surgery to the September 24, 2014 vessel incident.

17.

Weeks has not paid any medical bills since January 15, 2015, other than charges from Dr. Nutik. None of Dr. Berliner's bills or related bills for treatment ordered by Dr. Berliner have been paid. Unpaid medical expenses total $56,582.00. The parties stipulated that accrued maintenance, if owed, is payable at $20.00 per day and totals $9,340.00 as of May 17, 2016.

## **CONCLUSIONS OF LAW**

1.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides original jurisdiction over admiralty or maritime claims, and the Jones Act, 46 U.S.C. § 30104. Venue is proper because the defendants are subject to the personal jurisdiction of this Court.

2.

The matters before this Court include determination as to whether Weeks was negligent, whether the vessel was unseaworthy, whether such negligence and/or unseaworthiness caused injury to

Watson, the extent of any such injuries and, finally, whether Weeks was arbitrary in its handling of Watson's maintenance and cure claim, thereby entitling Watson to punitive damages and attorneys' fees.

3.

A seaman is entitled to recovery under the Jones Act . . . if his employer's negligence is the cause, in whole or part, of his injury. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997). An employer has the duty to provide a seaman employee with a reasonably safe place to work, which includes inspecting the vessel for hazards, providing gear tools sufficient to perform his assigned vessel duties, and training him on how to safely perform assigned vessel chores. *Johnson v. Offshore Express*, 845 F.2d 1347, 1353 (5th Cir. 1988); *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 636 (E.D. La. 2007). The cause of action under the Jones Act arises when one of the duties is breached and the employer's breach of duty plays a role, however slight, in causing the seaman's injury. *Landry v. Oceanic Contractors, Inc.,* 731 F.2d 299, 302 (5th Cir. 1984). The causation burden of proof is "featherweight." *Gavagan v. United States,* 955 F.2d 1016, 1019 (5th Cir. 1992).

4.

The owner of a vessel to which a Jones Act seaman is assigned or working at the time of his injury owes the duty of furnishing

the seaman with a seaworthy vessel. The vessel, its crew, and its appurtenances must be reasonably fit for their intended purpose to be seaworthy. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). Unlike the Jones Act, there is no knowledge requirement for a duty breach. Lack of knowledge or opportunity to correct the condition giving use to unseaworthiness does not mitigate the owner's absolute duty. *Id.* at 549. A vessel is unseaworthy if the injured seaman proves that the vessel owner failed to provide a vessel, including her equipment and crew, which is reasonably fit for the purposes for which it is to be used. *Jackson v. HUII Corp.*, 245 F.3d 525, 527 (5th Cir. 1992). The seaman must only prove that an unseaworthy condition existed that proximately caused his injuries. *Phillips v. Western Co. of America*, 953 F.2d 923, 928 (5th Cir. 1992). The vessel owner is essentially dealing with a species of strict liability in an unseaworthiness action, as the owner's knowledge or exercise of reasonable care is irrelevant in the seaworthiness context. *Id.*

5.

To recover damages from an unseaworthy condition, Watson is required to establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy. *Id.*; *Rogers v. Eagle Offshore Drilling Serv.*, 764 F.2d 300, 304 (5th Cir. 1985). Watson must prove that "the unseaworthy condition played a substantial part in causing the injury and that the injury

was either a direct result or a reasonably probable consequence of the unseaworthiness." *Johnson*, 845 F.2d at 1354.

6.

At the conclusion of the bench trial on May 17, 2016, the Court dictated oral findings and conclusions on the liability issues in this case. [See attached excerpts from trial transcript]. The Court will not repeat those oral reasons here, except to state that it found that Weeks was negligent and its vessel was unseaworthy. Further, there was no comparative negligence on the part of Watson.

7.

Watson was an able bodied and competent chief cook who received high marks for his work throughout his employment with Weeks. There is no evidence of a prior physical inability to perform his duties, nor does the medical evidence reveal any prior injury, treatment, or physical disability. Since the incident, Watson has consistently complained of left leg and left knee pain and symptoms that did not exist before the incident and are consistent with possible knee joint and lumbar nerve traumatic injuries. Both Dr. Hontas and Dr. Berliner, the treating physicians, relate these symptoms to September 2014 accident. Dr. Berliner also relates Watson's cervical disc injuries and symptoms to the incident. Weeks' negligence and the unseaworthiness of the

11

B.E. LINDHOLM proximately caused Watson's injuries and resulting damages.

8.

Under the Jones Act and the general maritime law, an injured seaman is entitled to recover for past loss of wages, future loss of earning capacity, unpaid medical expenses, and future medical expenses, as well as pain and suffering resulting from an injury caused by negligence and/or unseaworthiness. *Nichols*, 513 F. Supp. 2d at 636. Watson was 46 years old and earned approximately $55,510.00 per year. According to the economist's report, from date of accident through date of trial, Watson's past wage loss after taxes is $48,906.00. *See Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir. 1983) (*en banc*). Watson's future loss of earnings after commuting to present value is $696,038.00, assuming withdrawal from the workforce at age 59.8 years and total disability from the incident. The credible evidence is that Watson will return to work in an unskilled, light duty job when his medical condition is resolved. The Court awards $400,000.00 as a reasonable estimation of his future loss of earning capacity.

9.

The credible medical evidence is that Mr. Watson requires a two level cervical fusion, for which the estimated cost is $125,000, according to Dr. Berliner's report of March 17, 2016. He also needs a left knee arthroscopy and L4-5 Radiofrequency

12

neurotomy to treat the injuries he suffered aboard the B.E. LINDHOLM on September 24, 2014. Past unpaid medical expenses total $56,582.00. The Court awards past and future medical expenses, including the cost of future treatment and surgery by Dr. Berliner, and including any follow-up care until Watson has reached maximum medical improvement.

10.

Plaintiff has suffered from left knee joint, left leg and lumbar and cervical pain as well as intermittent headaches. He will likely undergo a left knee surgery, Radiofrequency neurotomy of the L4-5 nerve, and a two level cervical fusion in the future, requiring a total of six to twelve months of recovery. He will have permanent disability and restrictions. The Court finds that the Plaintiff is entitled to award of $100,000.00 for past pain and suffering and $250,000.00 for future pain and suffering.

11.

Under the general maritime law, a seaman like Watson is entitled to maintenance and cure from his employer for injuries incurred or aggravated in the service of the vessel. *The Osceola*, 189 U.S. 158, 175 (1903). Maintenance is a per diem living allowance for food and lodging comparable to what the seaman is entitled to while at sea; cure is payment of medical expenses incurred in treating the seaman's injury or illness. *Calmar S.S. Corp. Taylor*, 303 U.S. 525, 528 (1938); *Pelotto v. L & N Towing*

*Co.*, 604 F.2d 396, 400 (5th Cir. 1979). The ship owner's duty to pay maintenance and cure is broad. *Vella v. Ford Motor Co.*, 421 U.S. 1, 4 (1975). The maintenance and cure duty must be liberally interpreted for the benefit and protection of the seaman. *Vaughan v. Atkinson*, 369 U.S. 527, 531-32 (1962). Any ambiguity or doubt related to maintenance and cure must be resolved in favor of the seaman. *Id.* at 532; *Barto v. Shore Construction, LLC*, 801 F.3d 465, 476 (5th Cir. 2015).

12.

The ship owner's duty to pay maintenance and cure continues until the seaman reaches the point of maximum medical recovery, also known as maximum medical improvement (MMI). *Farrell v. United States*, 336 U.S. 511, 519-20 (1949). MMI is reached when the seaman recovers from the injury, the condition permanently stabilizes, or the condition cannot be improved further. *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1359 (5th Cir. 1987), *abrogated on other grounds by Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496 (5th Cir. 1995). The point of MMI is a medical determination, and not a legal one. *Breeze v. AWI, Inc.*, 823 F.2d 100, 104-05 (5th Cir. 1987). The ship owner bears the obligation to investigate a seaman's maintenance and cure claim and examine *all* medical evidence in determining whether maintenance and cure is owed. *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir. 1985). Any ambiguities or doubts regarding entitlement to cure or the date of

maximum medical improvement must be resolved in favor of the seaman. *Caulfield v. AC&D Marine, Inc.*, 633 F.2d 1129, 1132 (5th Cir. 1981).

13.

After a seaman has proved his initial entitlement to maintenance and cure, the burden shifts to the ship owner to prove that maximum cure has been reached. Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6-33 at 394. If the ship owner unilaterally decides to stop paying maintenance and cure and the seaman reasserts his right by bringing an action against the ship owner, the ship owner meets his burden of proof only by providing unequivocal evidence that the seaman has reached maximum medical cure. *Johnson v. Moreland Drilling Co.*, 893 F.2d 77, 79 (5th Cir. 1990). A second opinion contrary to the treating doctor's opinions regarding diagnosis or prognosis of an injured seaman does not provide the unequivocal evidence required for termination of maintenance and cure benefits. *Tullos*, 750 F.3d at 388; *Gorum v. Ensco Offshore Co.*, No. 02-2030, 2002 WL 31528460, at *6 (E.D. La. Nov. 14, 2002). Indeed, absent an unequivocal justification to terminate a seaman's maintenance and cure, a ship owner may subject itself to liability for punitive damages and attorney's fees if it terminates benefits nonetheless. *Rowan v. Chem Carrier Towing, LLC*, No. 12-712, 2015 WL 2097572, at *6 (E.D. La. May 5, 2015) ("[W]hen a ship owner chooses one doctor from many and follows his

recommendation," whether this behavior is "arbitrary and capricious" is a question for the jury.)

14.

The Court finds that Weeks arbitrarily terminated Watson's maintenance and cure benefits on January 15, 2015. At that time, the treating orthopedic surgeon reported that Watson needed further diagnostic and clinical work up, including a left knee MRI. Rather than authorize the tests, Weeks obtained a second opinion and relied solely on the IME to unilaterally terminate benefits. Weeks refused to authorize Dr. Hontas to continue treating Watson and he was never able to render a final diagnosis or prognosis. As a result, Dr. Hontas has never determined that Watson has reached maximum medical improvement.

15.

Termination of maintenance and cure must be unequivocal to insure that its beneficent purpose is achieved. Rather than inform Watson that he would no longer receive benefits, Weeks ordered Watson to travel back to the B.E. LINDHOLM to resume full duty or be terminated for abandonment. Watson did not learn that Weeks had refused to pay for further medical care until he returned to Dr. Hontas for a scheduled appointment and was told that Weeks refused to pay for any more medical care. Weeks not only cut off Watson's sole source of income and medical treatment, it required him to either return to work before being discharged from his treating

physician or be fired. This action forced Watson to hire an attorney, to which Weeks responded by filing a suit against Watson in this Court.

16.

Weeks continued its arbitrary refusal to pay maintenance and cure by intentionally ignoring and rejecting the opinions of the subsequent treating orthopedic surgeon Dr. Berliner, the MRI testing of February 10, 2015, and the positive nerve conduction study of July 30, 2015. In essence, Weeks simply ignored the opinions of two treating orthopedic surgeons and multiple radiologists because they did not agree with their diagnosis and treatment recommendations. Instead, Weeks hired a non-treating (and non-practicing) orthopedic surgeon and paid him $25,000 to write a seventy-five "report" criticizing everything and everyone except the doctor hired by Weeks to perform the IME. The Court orally stated its reasons for rejecting this doctor's incredible and biased testimony at trial.

17.

The only two treating physicians who testified at trial (one live and one by deposition) have never found that Watson has reached maximum medical improvement. Both physicians opined that further medical care and treatment is warranted. Rather than authorizing the recommended diagnostic testing and treatment, Weeks instead sent Watson to another doctor who performed an

17

"independent" medical examination and reported there was no need for further treatment. Weeks, relying on this single medical report, immediately terminated Watson's maintenance and refused to authorize any additional treatment or diagnostic testing that had been recommended by Dr. Hontas. Weeks then sued Watson in this Court, seeking a declaratory judgment that it owed no further maintenance or cure. However, as noted, by that time Weeks had already unilaterally terminated payment of maintenance and cure. The Court finds that Weeks was arbitrary and capricious in terminating Watson's maintenance and cure benefits on January 15, 2015 and in failing to reinstate benefits when Watson made renewed demand with supporting medical evidence. Watson is entitled to punitive damages from Weeks under the general maritime law, plus attorney's fees.

18.

For the foregoing reasons, the Court awards the following damages:

1. Past pain and suffering - $100,000.

2. Future pain and suffering - $250,000.

3. Past wage loss - $48,906.00

4. Loss of future earning capacity - $400,000.00

5. Maintenance through May 17, 2016 - $9,340.00

6. Past unpaid cure expenses - $56,582.00

7. Future maintenance expenses – $20.00 per day until Watson reaches MMI

8. Future medical expenses – $125,000 for two level cervical fusion plus cost of other treatment including surgery until Watson reaches MMI

9. Punitive damages for willful failure to pay maintenance and cure – $100,000.00

10. Attorney's fees incurred for the maintenance and cure claim – $50,000.00

**Total Award - $ 1,139,828 plus payment of maintenance and cure until MMI**

19.

Watson is entitled to pre-judgment interest at the rate of 4% per annum from date of injury until paid on the awards for past damages, including past wage loss, unpaid medical bills, past pain and suffering. Interest at the same rate is due on the remainder of the damages awarded from date of judgment until paid.

20.

Weeks Marine's Complaint for Declaratory Judgment is denied and dismissed with prejudice.

## CONCLUSION

Accordingly, and based on all the foregoing Findings of Fact and Conclusions of Law,

Judgment will hereafter be entered in favor of Rodney Watson and against Weeks Marine, Inc. as to all of Watson's claims.

New Orleans, Louisiana this 27th day of May, 2016.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE